UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15-CV-00059-GNS

RACETECH, LLC                                                                 PLAINTIFF

v.

KENTUCKY DOWNS, LLC
ENCORE GAMING, LLC                                    DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion to Dismiss (DN 21), Defendants' Motion to Dismiss for Failure to State a Claim (DN 22), and Defendants' Motion to Dismiss Amended Complaint (DN 29). The motions have been fully briefed and are ripe for decision. For the reasons stated below, the motions are **GRANTED.**

**I.     BACKGROUND**

In 2002, the United States Patent and Trademark Office ("USPTO") issued two patents to Plaintiff RaceTech, LLC ("RaceTech"): U.S. Patent Nos. 6,358,150 ("the '150 patent") and 6,450,887 ("the '887 patent"). (Am. Compl. 3). Both patents granted RaceTech ownership in "methods and apparatus for pari-mutuel historical gaming." U.S. Patent No. 6,358,150, at [54] (issued Mar. 19, 2002); U.S. Patent No. 6,450,887, at [54] (issued Sept. 17, 2002). In 2015, the USPTO issued a third patent—U.S. Patent No. 9,047,737 ("the '737 patent"), which claims "web based methods and apparatus for parimutual (sic) historical gaming."[1] *See* U.S. Patent No. 9,047,737, at [54] (issued June 2, 2015).

---

[1] The '887, '150, and '737 patents are collectively referred to as the "Asserted Patents."

Prior to the issuance of the '737 patent, RaceTech entered into a contract with Defendant Kentucky Downs, LLC ("Kentucky Downs") licensing wagering devices utilizing the '150 and '887 patents. (Am. Compl. 3). Kentucky Downs later terminated the contract and entered into an agreement with Defendant Encore Gaming, LLC ("Encore") for similar systems offering pari-mutuel gaming. (Am. Compl. 3).

On April 3, 2015, RaceTech filed its Complaint alleging infringement of the '887 and '150 patents. (Compl. 1, DN 1). On June 19, 2015, RaceTech amended its Complaint to add a claim for infringement of the '737 patent. (Am. Compl. 6). In the present motions, Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6), attacking the validity of the Asserted Patents under 35 U.S.C. § 101 on the basis that the patents claim the invention of an abstract idea or the implementation of an abstract idea with generic computer equipment. (Defs.' Mot. to Dismiss 1, DN 21; Defs.' Mot. to Dismiss 1, DN 22; Defs.' Mot. to Dismiss 2, DN 29).

## II. JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because it arises under the patent laws of the United States.

## III. STANDARD OF REVIEW

In order to survive a challenge for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true."

*Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Id*. (internal quotation marks omitted) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement."[2] *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (citation omitted).

## IV.     DISCUSSION

### A.     Patent Eligibility under 35 U.S.C. § 101

Under 35 U.S.C. § 101, patent protection is granted to "[whomever] invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, . . . subject to the conditions of this title." As an implicit limitation on this statutory standard, the U.S. Supreme Court has long recognized that laws of nature, natural phenomena, and abstract ideas are not patentable because these represent "the building blocks of human ingenuity" which should not be inhibited by the grant of monopolistic patents. *LeRoy v. Tatham*, 55 U.S. (14 How.) 156, 174-175 (1853); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1923 (2012) ("[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it."). On the other hand, the Supreme Court has expressed caution in application of the exclusionary principle, "lest it swallow all of patent law." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citing *Mayo*, 132 S. Ct. at 1293-94). As the Supreme Court has noted, "in

---

[2] In addressing the motion to dismiss, the Court is analyzing the facial validity of the Asserted Patents as a matter of law, not a finding of fact. While the parties have extensively argued the applicability of the clear and convincing evidence standard, that is not the appropriate standard in this context. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (*Ultramercial II*) (Mayer, J., concurring).

3

applying the Section 101 exception, we must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into 'something more', thereby 'transform[ing]' them into a patent-eligible invention." *Id.* (alterations in original) (internal citation omitted) (citation omitted).

In *Alice Corp. Pty. Ltd. v. CLS Bank International*, the Supreme Court articulated a two-step process for evaluating whether patent claims are directed to patent-eligible concepts versus laws of nature and abstract ideas, embodying "the longstanding rule that [a]n idea of itself is not patentable . . . ." *Id.* at 2355 (internal quotation marks omitted) (citation omitted). The Supreme Court explained:

> [W]e determine [first] whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.

*Id.* at 2355 (third alteration in original) (internal citations omitted) (quoting *Mayo*, 132 S. Ct. at 1296-98). This second step is a "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent on the [ineligible concept] itself.'" *Id.* (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1294).

The Court in *Alice* initially determined that the patent claims before it—a method of exchanging financial obligations between parties through "shadow accounts" managed by a third party using generic computer equipment—was equivalent to intermediated settlement, a practice "long prevalent in our system of commerce . . . ." *Id.* at 2356 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)). In describing the method before it as a "fundamental economic practice," the Court held that the intermediated settlement claims constituted an abstract idea. *Id.* at 2357

4

(citation omitted). The Court further found the patent lacking any transformation sufficient to elevate the abstract idea into a patent-eligible application. *See id.* at 2357-58. "Taking the claim elements separately, the function performed by the computer at each step of the process is '[p]urely conventional.' Using a computer to create and maintain 'shadow' accounts amounts to electronic recordkeeping—one of the most basic functions of a computer." *Id.* at 2359 (citation omitted). Utilizing computers to obtain data, adjust account balances, and issue automated instructions did "no more than require a generic computer to perform generic computer functions." *Id.*

The Supreme Court concluded that the methods claims "amount[ed] to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer. Under our precedents, that is not '*enough*' to transform an abstract idea into a patent-eligible invention." *Id.* at 2359-60 (internal citation omitted) (citations omitted). Reaching the same conclusion with respect to the system claims, the Court stated:

> [T]he system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the systems recite a handful of generic computer components to implement the same idea. . . . Because [the] system and media claims add nothing of substance to the underlying abstract idea, we hold that they too are patent ineligible under § 101.

*Id.* at 2360.

The Supreme Court has not delineated the precise parameters for determining what constitutes an abstract idea or what additional "something" will suffice to boost the abstraction over the patentability threshold. One formulation that has been used to identify non-patentable abstract ideas is the "machine-or-transformation test." Under this analysis, a process is patentable "only if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a

5

particular article into a different state or thing." *Bilski*, 561 U.S. at 602 (citation omitted). Although the Supreme Court rejected this as an exclusive test in *Bilski v. Kappos*, the Court also indicated that "the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Id.* at 604. Recognizing the hedging method in that case as an "economic practice long prevalent in our system of commerce," the Court held the patent impermissibly claimed an abstract idea without any additional transformative element. *Id.* at 611 (internal quotation marks omitted) (citation omitted).

Another useful principle in analyzing patentability under Section 101 holds that business methods generally do not pass muster.[3] Although *Bilski* also disproved of the categorical denial of patents covering mere business methods, the Court recognized that business method patents were traditionally granted only rarely and "raise special problems in terms of vagueness and suspect validity." *Bilski*, 561 U.S. at 608 (citation omitted). The Court further noted that "the Patent Act leaves open the *possibility* that there are *at least some* processes that can be fairly described as business methods that are within patentable subject matter under § 101." *Id.* at 609 (emphasis added). Thus, though not prohibited *per se*, it would appear that a business method patent demonstrating the required "something more" would be unusual.

In response to *Bilski*'s invitation that the Federal Circuit develop parameters in this regard, Judge Mayer's concurrence in *Ultramercial, Inc. v. Hulu, LLC* articulated a "technological arts" test derived from *Bilski* and *Alice*, that is, "a rule that claims are impermissibly abstract if they are directed to an entrepreneurial objective, such as methods for

---

[3] In *Bilski*, the Supreme Court noted that there is no precise definition of what constitutes a business method under Section 101. *See Bilski*, 561 U.S. at 607 (citing Bronwyn H. Hall, *Business and Financial Method Patents, Innovation, and Policy*, 56 SCOTTISH J. POL. ECON. 443, 445 (2009)).

6

increasing revenue, minimizing economic risk, or structuring commercial transactions, rather than a technological one . . . ." *Ultramercial II*, 772 F.3d at 721 (Mayer, J., concurring). Under this paradigm, "claims must harness natural laws and scientific principles—those truths about the natural world that have always existed—and use them to solve seemingly intractable problems. The claims must, moreover, not only describe a technological objective, but set out a precise set of instructions for achieving it." *Id.* at 722. This technological arts test has not been considered by the Supreme Court, but may be helpful in analyzing the Asserted Patents.

B. <u>Analysis of the Asserted Patents</u>

RaceTech's patents describe gaming methods and systems for pari-mutuel wagering[4] on "historical events" generally, and in particular, horse, dog, and "animal" racing. '737 Patent col. 12 l. 63. These games are intended to increase the utility of recorded horse races and offer gambling patrons a greater number of wagering opportunities compared to live or simulcast races, thereby placing horse tracks in a better competitive position with casinos and slot machines. *See* '150 Patent col. 1 l. 36 to col. 2 l. 7; '887 Patent col. 1 l. 43 to col. 2 l. 12; '737 Patent col. 1 ll. 26-43.

In each patent, the system consists of:

- a video server ('150 Patent col. 11 l. 32; '887 Patent col. 14 l. 7; '737 Patent col. 15 l. 55);
- a game server ('150 Patent col. 11 l. 35; '887 Patent col. 14 l. 9; '737 Patent col. 15 l. 58);
- a gateway to the game server ('150 Patent col. 11 l. 39; '887 Patent col. 14 l. 13; '737 Patent col. 2 l. 64); and
- game terminals ('150 Patent col. 11 l. 42; '887 Patent col. 14 l. 10; '737 Patent col. 15 l. 57).

---

[4] *Black's Law Dictionary* defines the term "pari-mutuel betting" as "[a] system of gambling in which bets are placed on a race pooled and then paid (less a management fee and taxes) to those holding winning tickets." *Pari-Mutuel Betting*, BLACK'S LAW DICTIONARY (10th ed. 2014).

The hardware components of the system are described generically as being available from manufacturers such as Cisco Systems, Compaq Computer Corporation, Stratus Computer, Dell Computer Corporation, N-cube, Microsoft Corporation, and Oracle Corporation. *See* '150 Patent col. 3 ll. 42-52, col. 6 ll. 64-65; '887 Patent col. 3 ll. 49-60, col. 10 ll. 38-42, col. 11 ll. 53-56, col. 11 ll. 9-14; '737 Patent col. 4 ll. 25-30, col. 12 ll. 20-24, col. 12 ll. 56-59. Game terminals for bettors' use in placing wagers are "any computer having a user interface," a keyboard, a pointer or mouse, a video monitor, and software. '150 Patent col. 6 ll. 58-62; '887 Patent col. 8 ll. 5-7; '737 Patent col. 3 ll. 14-17. The patents also claim a method for pari-mutuel wagering which consists of "accessing the system." *See* '150 Patent col. 13 ll. 43-44; '887 Patent col. 16 ll. 29-30; '737 Patent col. 2 ll. 7-8.

The first patent granted—the '150 patent—calls for configuration of the components connected through use of networks to results from past races (including video footage) for wagering. *See* '150 Patent, at [57]. Two exemplary games called "Quick Trifecta" and "Thoroughbred Mania" are appended to each Asserted Patent, and these games allow customers to bet on races presented on their computer monitor, watch video footage, and either collect an "instant payout" or qualify for additional wagering pools in the event of a winning wager. '150 Patent col. 8 ll. 55 to col. 16 ll. 19. Both games have a minimum guaranteed payout, which is funded from a portion deducted from all wagers. *See* '150 Patent col. 9 ll. 57-65.

The '887 patent repeats largely verbatim the contents of '150, but expands the number of independent claims from 2 to 5 and the dependent claims from 41 to 71. The '887 patent adds an ability to connect the customer's monitor to live racing in addition to the recorded race library. *See* '887 Patent col. 6 l. 57. Further, the '887 patent includes hardware-based fault tolerance to

8

provide for continuous operation in the event of component failure. *See* '887 Patent col. 3 ll. 46-48.

The '737 patent—issued just months ago and roughly thirteen years after '150 and '887—contains a great deal of the substance of its predecessors, but also describes the generation of an alarm to the operator when the award pool runs below a minimum level.[5] *See* '737 Patent col. 16 l. 3. Additionally, this iteration of the gaming system allows the player to select handicapping data by horse, jockey, or trainer, and to assign proportionate weights to each factor. *See* '737 Patent col. 6 ll. 5-65. The '737 patent also recites claims for computer-readable non-transitory storage media programmed to perform game functions, which was not part of the '150 or '887 patents.[6] *See* '737 Patent col. 18 ll. 1-4.

C. **Application of *Alice* to '150 & '887 Patents**

Defendants claim that RaceTech's '150 and '887 patents regarding methods and apparatus for pari-mutuel historical gaming are abstract ideas that involve no inventive concept that sufficiently transforms the invention into patentable subject matter. Patents '150 and '887 are fundamentally the same, though '887 essentially subsumes '150; each claims a patent over the process involved with pari-mutuel gambling based on past events. *See* '150 Patent col. 11 ll. 31-43; '887 Patent col. 14 ll. 5-11.

---

[5] As with the '150 and '887 patents, the '737 patent utilizes a game server, gateway, video server, administrative terminal, and game terminals. *See* '737 Patent col. 4 ll. 11-14.

[6] The term "computer-readable storage media" refers to storage devices like computer hard drives or RAM. *See Ex parte Uslontsev*, No. 2012-000905, 2014 WL 4254152, at *1 (P.T.A.B. Aug. 11, 2014). To be eligible for patent protection, computer-readable storage media must be non-transitory because transitory signals are not patentable. *See In re Nuijten*, 500 F.3d 1346, 1357 (Fed. Cir. 2007). *See also* MPEP § 2106 (9th ed. Rev. 07.2015, Nov. 2015) ("Non-limiting examples of claims that are not directed to one of the statutory categories . . . [includes] transitory forms of signal transmission (for example, a propagating electrical or electromagnetic signal *per se*) . . . ." (citation omitted)).

9

Following the analysis of *Alice*, this Court must first determine if the '150 and '887 patents claim ownership over patentable subject matter versus an abstract idea. Courts have consistently held that fundamental principles are abstract ideas. On the other hand, when a party invents something entirely new, the idea is not abstract. *See Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2216-17 (2013) (finding that while a DNA strand found in nature is unpatentable subject matter, a lab-created DNA strand not found in nature would be patentable). Furthermore, a practice with a long history is more likely to be abstract than an entirely new practice. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 1001 (C.D. Cal. 2014). A review of RaceTech's '150 and '887 patents indicates that the concept in question is the wagering on unknown past events rather than a memory test, as suggested by Defendants. (Defs.' Mem. in Supp. of Mot. to Dismiss 5, DN 29-2). The patents disclose that the game's purpose is to ensure an unknown result rather than to test the player's ability to recall past events. *See* '150 Patent, at [57]; '887 Patent, at [57]. Therefore, the Court must consider whether such a game based on unknown events is an abstract idea.

RaceTech argues that the abstract idea principle is only intended to apply to "fundamental mathematical formulas" and "fundamental economic principles." (Pl.'s Resp. to Mot. to Dismiss 15, DN 31 [hereinafter Pl.'s Resp.]). The Court rejects this view as too narrow. The abstract idea principle has also invalidated patent claims beyond those involving mathematical formulas and economic principles. *See Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 129 (1947) (finding different strains of bacteria unpatentable); *Myriad Genetics*, 133 S. Ct. at 2109 (finding newly discovered DNA strand unpatentable). More specifically, courts have also applied the abstract idea principle to invalidate patents related to recreational wagering. *See, e.g.*, *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006-07 (Fed. Cir.

10

2014); *Everglades Game Techs., LLC v. Supercell Inc.*, No. 14-643-GMS, 2015 WL 4999654, at *3-4. (D. Del. Aug. 21, 2015).

In *Planet Bingo*, the plaintiff owned two patents over computer-aided management of bingo games. *See Planet Bingo*, 576 F. App'x at 1006. The defendant claimed that both patents covered unpatentable subject matter, as the patents attempted to claim ownership over the abstract idea of playing a game of bingo. *See id*. at 1008. The court struck down the plaintiff's claims over its management of bingo cards regardless of how efficient the invention made playing the game, reasoning that the steps in the patent could be performed by an ordinary person utilizing a pen and paper and mental processes. *See id*. at 1007.

*Planet Bingo* supports the conclusion that the '150 and '887 patents comprise abstract ideas. *Planet Bingo* establishes that ideas are abstract when a claim "consists solely of mental steps which can be carried out by a human using pen and paper." *Id.* (internal quotation marks omitted) (citation omitted). Under this analysis, an idea may be abstract regardless of how efficiently the invention implements the process. *See id*. Thus, RaceTech's claim would be abstract if the process of pari-mutuel gaming could be carried out by a human using mental steps and a pen and paper. *Id*.

The wagering systems described in '150 and '887 patents encompass a fundamental human activity. *See Alice Corp.*, 134 S. Ct. at 2355. Applying the reasoning of *Planet Bingo*, the asserted claims are abstract since a person could achieve pari-mutuel wagering through ordinary mental steps. *See Planet Bingo*, 576 F. App'x at 1007. The computations involved with this process require simple mathematic functions, which could be accomplished on paper—though hand-computation would certainly be much more cumbersome. Betting is intrinsic to horse racing, and pari-mutuel wagering on horse races has been conducted in the United States

since at least 1927—long before the invention of computers. *See* STEVEN A. REISS, CITY GAMES: THE EVOLUTION OF AMERICAN URBAN SOCIETY & THE RISE OF SPORTS 188 (1991). *See also* FERRAN CANYAMERES, L'HOMME DE LA BELLE ÉPOQUE 35 (1946) (noting that pari-mutuel betting was invented in 1867). This fundamental activity of wagering on sporting contests, thus, is properly characterized as an abstract idea. *See Alice Corp.*, 134 S. Ct. at 2356-57; *Bilski*, 561 U.S. at 611-12.

The singular innovation in this case is that RaceTech's wagering method/system embodies the technique of allowing bets on events that have already occurred—perhaps months or years earlier. The question thus becomes whether betting on past events changes the inherent nature of the claimed patents to something other than abstract ideas. In this regard, the Federal Circuit noted in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) (*Ultramercial I*), *vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014):

> In an effort to grapple with this non-statutory "abstractness" exception to "processes," the dictionary provides some help. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 5 (11th ed. 2003) (defining abstract as "disassociated from any specific instance . . . expressing a quality apart from an object <the word *poem* is concrete, *poetry* is [abstract]>"). An abstract idea is one that has no reference to material objects or specific examples—*i.e.*, it is not concrete.

*Id.* at 1342-43. Extending the poetry/poem analogy, flight would be abstract but an airplane would be concrete. The Court believes that characterizing RaceTech's patents as concrete would be the equivalent of saying that flight is abstract, but flying while facing backwards is concrete. Pari-mutuel gambling on live races is a longstanding practice, and betting on recorded races does not change the fundamental characteristics of the activity. Given that the abstract idea limitation applies to fundamental economic practices, *Planet Bingo* indicates that computer-aided gambling, including wagering on past events, is analogous to those principles. *See Planet Bingo*,

576 F. App'x at 1008-09. *See also Alice Corp.*, 134 S. Ct. at 2356-57; *Bilski*, 561 U.S. at 611-12;

Another wrinkle with the subject patents is the implementation of the claimed processes and methods through use of computer equipment. Conducting this activity through computer hardware and software, however, likewise does not change the abstract nature of the subject. As discussed above, the analysis turns on the fundamental nature of wagering which can be achieved with ordinary mental steps, despite the use of computers to speed up the process.[7] *See Alice Corp.,* 134 S. Ct. at 2354-55; *Planet Bingo,* 576 F. App'x at 1007 (citing *Alice Corp.*, 134 S. Ct. at 2347; *Bilski*, 561 U.S. at 610-11). Thus, the Court concludes that the systems and methods described in '150 and '887 cover abstract ideas.

As directed by *Alice*, finding that pari-mutuel wagering on historic events is an abstract idea is not the end of the analysis. "Abstract ideas may still be patent-eligible if they contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Id*. (citing *Alice Corp.*, 134 S. Ct. at 2357). Inventive concepts represent significantly more than just the abstract idea and cannot be merely the implementation of an abstract idea through a general computer process. *See Alice Corp.*, 134 S. Ct. at 2354-55. Indeed, patents that claim ownership over an abstract idea must integrate that idea into "something more" than merely the idea itself. *See id*. at 2354. The Supreme Court has held that a combination of processes may be patentable even if each individual element is abstract. *See*

---

[7] RaceTech also argues that its invention does not preempt others from engaging in gambling on historical events and that other inventors are free to utilize any process that does not involve a "video server" or "game terminal." (Pl.'s Reply 26). Further, RaceTech claims that it is not asserting ownership over historical gambling in other contexts besides racing. RaceTech posits the use of "tables" and "photographs" as an alternative to videos. (Pl.'s Reply 26). These arguments are unpersuasive. RaceTech cannot claim exclusive ownership over the inclusion of video and game terminals in historical gaming. *See Planet Bingo*, 576 F. App'x at 1008-09 (finding claim over use of video and game terminals invalid).

*Diamond v. Diehr*, 450 U.S. 175, 187 (1981). When considering whether an inventive concept exists, the Court must consider the entire patent as a whole rather than each claim individually because "a combination of conventional elements may be unconventional." *Cal. Inst. of Tech.*, 59 F. Supp. 3d at 992-93 (citation omitted).

Defendants argue RaceTech's patent does not contain an inventive concept because the processes and systems claimed by RaceTech's patent are "well-understood, routine, [and] conventional" processes performed by everyday computer systems and the '887 patent describes nothing more than basic computer functions. (Defs.' Mem. in Supp. of Mot. to Dismiss 14). These elements are not viewed in a vacuum, however, as the entire claim must be analyzed to determine if an inventive concept exists.[8] *See Diehr*, 450 U.S. at 188.

When computers communicate over a network, the process is functionally generic and unpatentable. *See buySAFE, Inc. v. Google Inc.*, 765 F.3d 1350, 1355 (Fed Cir. 2014). The Court cannot find "something more" through the basic use of computers to accomplish a process already well-known. *See Alice Corp.*, 134 S. Ct. at 2358 (citing *Parker v. Flook*, 437 U.S. 584, 592 (1978)). Furthermore, additional utilization of generic hardware in combination with a computer system is insufficient to constitute a transformative innovation. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). These concepts have been particularly applied in the context of computer systems and

---

[8] Defendants specifically argue that independent claims 1, 29, 48, 61, and 71 of the '887 patent describe basic computer functions such as storage, server-to-server communication, gateways, and network connections. (Defs.' Mem. in Supp. of Mot. to Dismiss 13-16). Defendants reference several dependent claims utilizing basic computer equipment and processes such as keyboards, mice, storage devices, and various types of computer data. (Defs.' Mem. in Supp. of Mot. to Dismiss 21-24). Since the dependent claims are merely elements of the entire process associated with claims in the '150 and '887 patents, the Court declines to address these separately.

hardware utilized in conjunction with computerized gambling. *See Planet Bingo*, 576 F. App'x at 1006-07. *See also Everglades Game Techs.*, 2015 WL 4999654, at *3-4.

On their face, neither the '150 nor '887 patent appears to describe anything beyond various pieces of ordinary computer equipment communicating in a functionally generic way. While RaceTech argues that viewed as a whole the '150 and '887 patents constitute something more, these systems accomplish fundamentally standard processes. The video server and game server act as storage devices to provide the data and videos needed to accomplish a game of pari-mutuel wagering.[9] (Pl.'s Resp. 22-23). The information is then sent to a game terminal where players can play the game. (Pl.'s Resp. 22-23). An administrative terminal exists to manage the game through totalization.[10] *See* '150 Patent fig. 1, item 22; '887 Patent fig. 1, item 18. The servers and terminals communicate over a network facilitated by a gateway. *See* '150 Patent fig. 1, item 16; '887 Patent fig. 1, items 15-16. All of this equipment is described as being readily available through well-known manufacturers such as Dell, Microsoft, and Compaq. None of these elements appear to be transformative.

Case law dictates the conclusion that the claimed systems do not describe patentable subject matter. *See Alice Corp.*, 134 S. Ct. at 2360 (implementation of computer equipment to accomplish basic calculations, data storage, and transmission held unpatentable); *buySAFE, Inc.*, 765 F.3d at 1355 (computers communicating with each other over a network comprising various

---

[9] This configuration appears to differ from regular simulcast racing primarily in that the live video feed is replaced with recorded images.

[10] The term "totalizator" (also spelled "totalisator"), which is synonymous with the term "pari-mutuel," is defined as "a machine for registering the bets and computing the payoff in pari-mutuel betting." *Totalizator*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/totalizator (last visited Feb. 8, 2016); *Pari-mutuel*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/pari-mutuel (last visited Feb. 8, 2016). RaceTech's patent incorporates a totalisator system in the "Administrative Terminal" labeled in the '150 patent as "Gateway to Tote System" in its '887 patent. *See* '150 Patent fig. 1, item 22; '887 Patent fig. 1, item 16; '887 Patent col. 3 ll. 43-44.

15

pieces of generic computer equipment ineligible for patent protection); *Wells Fargo Bank*, 776 F.3d at 1347 (computer system utilizing scanners invalid under Section 101); *Planet Bingo*, 576 F. App'x at 1008-09 (system consisting of "a computer with a central processing unit, a memory, an input and output terminal, a printer, in some cases a video screen, and a program . . . enabling the steps of managing a game of bingo" did not constitute an inventive concept). The use of generic computer systems to achieve well-known principles in an industry does not change an abstract idea into patentable subject matter. *See Flook*, 437 U.S. at 592. By contrast, a process may be patentable when standard equipment is used to accomplish an entirely new result not before achieved in an industry. *See Diehr*, 450 U.S. at 175. In *Diehr*, the contested process utilized a combination of abstract ideas to create something that had never been achieved in the pertinent industry. *See id.* at 178 (using a thermocouple to record constant temperature measurements inside the rubber mold—something "the industry ha[d] not been able to obtain").

The inventive element of RaceTech's patents is the use of historical data instead of live data. Instead of providing something more, however, the Court believes the '150 and '887 patents provide something *less*. Simulcast horse racing has long been utilized in the horse racing industry. Simulcast broadcasts provide *live* results from tracks across the country in a wide variety of weather conditions. None of the frequent complications occurring in real-time races would impair wagering on pre-recorded races because the winners have been determined before wagering on the recorded race even commences. Though video footage or simulation of the recorded race can be shown for its entertainment value, the results of the betting could be revealed almost immediately because the outcome is "known" in advance by the computer. This is something *less* than live racing because all of the vicissitudes of the actual contests have already occurred before the video "race" is shown to the bettor.

RaceTech's claimed "something more" amounts to replacing a live broadcast with what is akin to—in archaic terms—inserting a video tape into a VCR and pressing "play." Although the practice of allowing bettors to gamble on old races may not have been available before the '150 and '887 patents, that fact alone does not render the ideas patent-eligible. "[G]roundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry." *Myriad Genetics*, 133 S. Ct. at 2117 (citation omitted). "[W]hile a person may have 'invented' something under the sun, it does not qualify for patent protection unless the Patent Act's statutory requirements have been satisfied." *Ultramercial II*, 772 F.3d at 720 (Mayer, J., concurring). *See also id.* at 716 (holding "that some of the [patent's] steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue."); *OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359, 1364 (Fed. Cir. 2015) (collecting customer statistics was "well-understood, routine, conventional data-gathering activities that do not make the claims patent eligible." (citing *Alice*, 135 S. Ct. at 2359; *Mayo*, 132 S. Ct. at 1298)); *Everglades Game Techs. v. Supercell, Inc.*, No. 14-643-GMS, 2015 WL 4999654, at *4 (D. Del. Aug. 21, 2015) (finding no inventive contribution to gathering, storing, and displaying data, and enabling customer access via computer interface). In this instance, the collected data consists of recorded horse races and there is certainly nothing novel about recording a sporting event for later viewing. Under these circumstances, RaceTech's patents allowing customers to bet on recorded races through use of conventional computers do not contain a sufficiently transformative inventive concept to render them patentable. *See Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1371 (Fed. Cir. 2015) (denying patent eligibility for claims consisting of entering data into computer database, organizing, and transmitting information to user through generic computer equipment).

**D.** **'737 Patent: "Web Based Methods and Apparatus for Pari-mutual Historical Gaming"**

The '737 patent involves similar, and sometimes identical, claims to the '887 and '150 patents. The '737 patent distinguishes itself in independent claims 8 and 15 that provide for a "seed pool" which allows additional funds to be added to the total award amount if the amount is below the "threshold value." *See* '737 Patent col. 16 l. 39 to col. 17 l. 37. Even more so than wagering on past events, coverage of amounts overdrawn by customers seems to comprise a fundamental economic concept. For example, such a practice appears analogous to "the house" covering bets at a casino. Under '737, the administrator provides security to ensure winners are paid even when the pot lacks sufficient funds to pay the winners, much like the Federal Deposit Insurance Corporation provides security when a bank lacks sufficient funds to cover the value of its customers' deposits. Courts have held that similar risk-reducing economic policies are abstract. *See Bilski*, 561 U.S. at 599 (risk hedging against price changes in energy commodities held to be abstract). As with pari-mutuel wagering, the concept of insurance protection for credit owed is a fundamental human practice with a long history and is therefore abstract. *See Alice Corp.,* 134 S. Ct. at 2354-55. *See also Cal. Inst. of Tech.*, 59 F. Supp. 3d at 1001.

As previously noted, courts have compared such principles to practices in the gaming industry and found them to be abstract. *See Planet Bingo*, 576 F. App'x at 1006-07; *Everglades Game Techs.*, 2015 WL 4999654, at *3-4. Here, the '737 process manages a game of wagering by ensuring sufficient funds to pay successive winners through "seed pools" funded from previous wagers. *See* '737 Patent col. 2 ll. 37-39. By adding its own funds to the wagering pools, the operator then becomes involved in the bet—at least to the extent of ensuring the availability of funds to pay off winning bets at the minimum threshold level. Betting against the

18

house is a fundamental and abstract concept. Thus, the Court finds the additional claims in the '737 patent are abstract.

As with '150 and '887 patents, RaceTech has failed to establish the "something more" needed to transform this abstract idea into patentable subject matter. A combination of purely generic computer equipment is utilized to accomplish the seed pool process of the '737 patent. *See* '737 Patent col. 4 ll. 23-32. As the patent involves the same combination of equipment and systems, the Court finds the systems and methods in the '737 patent are not inventive concepts.

E.     **Alternative Tests for Validity**

The conclusion that the contested patents do not pass muster is also supported by the various, albeit non-exclusive, tests discussed above. *See Bilski*, 561 U.S. at 602-04; *Ultramercial II*, 772 F.3d at 721-22. Under the machine-or-transformation test, the processes described by these patents are clearly not tied to any particular machine or apparatus. Instead, the equipment necessary for the operations consists of name-brand computer equipment that is widely available. Additionally, there is no transformation of any particular article into a different state, only the placement of a wager utilizing an ordinary computer. Likewise, the patents at issue are best characterized as encompassing a business method. RaceTech's patents describe a business method with the express purpose of adding greater shelf life to the operator's inventory of gaming events by recycling previously recorded races. This may very well be an excellent money-making concept, but it hardly qualifies as a transformative invention or discovery.

Finally, the patents in this case would not qualify under a technological arts test. These patents claim methods that are intrinsically entrepreneurial in nature and clearly do not harness any natural laws or scientific principles to solve seemingly intractable problems. While the

19

Asserted Patents may comprise a profitable means of reusing the results from prior races,[11] they do not constitute patentable inventions under Section 101.

## V.    CONCLUSION

RaceTech's patents encompass subject matter facially unpatentable under Section 101. Dismissal is appropriate at this time when there has been a minimum expenditure of time and money by the parties and the court. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Indeed, other courts have dismissed cases at this stage in litigation involving similarly unpatentable computer processes. *See, e.g.*, *buySAFE, Inc.*, 765 F.3d at 1351; *Wells Fargo Bank*, 776 F.3d at 1344; *Ultramercial II*, 772 F.3d at 711.

The only plausible reading of the '150, '887, and '737 patents reflects that they are ineligible for patent protection. The Asserted Patents are abstract ideas, and RaceTech has failed to demonstrate an inventive concept required to transform these claims into patentable subject matter within the meaning of Section 101. Thus, the claims asserted in the Amended Complaint must be dismissed.

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (DN 21, 22, 29) are **GRANTED**.

**Greg N. Stivers, Judge**
**United States District Court**
February 29, 2016

cc:    counsel of record

---

[11] Kentucky Downs reportedly grossed over $30 million dollars with its historical racing machines in one month during the pendency of this action. *See* Pl.'s Mot. to Dismiss Ex. A, at 4, DN 22-3, *RaceTech, LLC v. Ky. Downs, LLC*, No. 1:15-CV-00082-GNS (W.D. Ky.).